Minors. Thank you. The next case, call four, an argument in the interest of A.S. and A.S. Minors. Counsel? Thank you, Your Honors. May it please the Court, Madam Clerk, the Honorable opposing counsel, this matter concerns a juvenile abuse case from Wayne County, Illinois. The facts are this. This concerns a family of four, a mother, a father, and two teenage daughters who were 15 and 16 at the time of the allegations. The 16-year-old daughter alleged that at some point in May or June of 2010 that her father had touched her breast. The petition contained only that allegation. That was the only thing that was truly at issue in that case. The 15-year-old daughter was steadfast in maintaining that no abuse had occurred. However, the state had put her in as an abuse minor for the fact that she was in the household at the time the alleged abuse occurred. A juvenile abuse adjudication was held in February and March of 2011. The Court returned with an adjudication of abuse on both cases. In April of 2011, the Court determined that it would make both minors wards of the Court. That brings us here today. Our Illinois Supreme Court, in N. Ray Arthur, which I cited on page 12 of my brief, states that the proceeding for adjudication of wardship represents a significant intrusion into the sanctity of the family which should not be undertaken lightly. I think that is a word to consider here in this case throughout. Our first contention is that the evidence was not sufficient to support a finding of abuse in this case. In this case, the father had been consistent throughout the entire proceedings, maintaining that he had not abused his daughter. The allegation first came to his attention in August of 2010 when he was contacted by DCFS and he was interviewed by a DCFS worker and a Wayne County Sheriff's deputy. When he talked to those men, both of those men testified in court, he was straightforward saying, I don't remember ever touching her breast. At that point, the allegation that was made to DCFS was very much the daughter had told DCFS that this touch occurred. She wasn't sure if it was accidental. She wasn't encouraged. She just wanted to tell somebody. DCFS investigated. The Sheriff's Department was there also in that investigation. The Sheriff's deputy, Jonas Consolving, testified at the hearing and testified that he interviewed Michael. Michael told him at that time he didn't remember touching her. It might have been an accidental bump or rub just in the course of ordinary family life. The deputy said that Michael was believable in this matter. He didn't have any reason to believe that this was a touch for sexual gratification. The Department of Children and Family Services did go ahead and indicate the charge, however, and Michael moved out of the home as part of a safety plan in order to try to keep his children intact. As time went on, the teenage daughter expanded her allegations. Michael was interviewed again by the Sheriff's deputy and a different DCFS worker. Those new allegations were not fully available to Michael at the time of the adjudication because DCFS had not finished its investigation. The Sheriff's deputy said that no charges were pending on any of these and that continues to be the status as of today. Michael, throughout this entire process and in his testimony in front of the court, always maintained his innocence. He continues to maintain his innocence. He would tell you the same today as he did in August of 2010. He said that if there was some sort of a touch, it was an accidental bump, whether it was when he was rubbing his daughter's back after her injuries from a car accident or just in the course of walking around in family life. He did not intend to touch her in that way. Others who knew these two individuals very well also testified on Michael's behalf. The first is Amber. Amber is the 15-year-old daughter, the younger sister, and she testified that her father had never touched her in any of these ways. She testified that she had never seen her father touch her sister in any of these ways until one incident that summer where the three of them, the father and the two sisters, discussed this bump or this touch. Amber had not heard any complaining of anything of this matter. And she testified that she does not believe that this happened. She testified that she believes that Amy has been a liar since seventh or eighth grade. And further, she testified that she's worked with her father in his machine shop, you know, when he's around the guys, and she hasn't even heard him making sexual jokes when he's around the guys. That's an environment when, you know, someone would expect someone to do something like that.  Omega testified that she was close to her granddaughter Amy and that she had, you know, even that summer worked alongside with her in the home, had a close, caring relationship. She was somebody that Amy could come to and confide in. Amy said that she did confide to her grandmother about this issue. We'll talk about that issue a little bit more later. But the grandmother stated when Amy brought this to her, she was smirking or grinning at the time. And the grandmother didn't take it seriously because her demeanor was not that of somebody who had been traumatized or abused. It was a smirk. The grandmother also testified that during the year before that, there had been a number of incidents where Amy had been caught in lies. And she testified that she did not believe that Amy was a truthful person. Further, the wife in this case, Lisa, who was by this time clearly adverse to Michael, when she was first interviewed by DCFS, she told the investigator that there was no way that her husband could have done this. She didn't believe that he would do something like this. Even six months later, when she's in front of the juvenile court, she still doesn't have any reason that she thinks that Michael might have done this. Nothing pops up to her in the intervening time that says, hey, this was a red flag. The only support that the state had for the allegations was the testimony of the 16-year-old daughter, Amy. And there are a couple of important things to note about this testimony. First of all, it was not consistent. We started out in August of 2010 with a very minor allegation that there was just this touch which may have been accidental. Certainly it was not for sexual gratification. And then the testimony escalated as time went on. And as I point out in my brief, you know, a respondent was not privy to the full allegations by the time of the adjudicatory hearing. He in no way could have crafted his testimony to meet her allegations because he just didn't know the full extent of them. And in particular, Amy's testimony has a couple of inconsistencies which I think are quite glaring given the entire circumstances. First of all, Amy in her testimony testified quite specifically as to the events of the day that she alleged this happened. She said she did not know the date that this happened, but this is what happened on this date. So when she testified, she said that this happened and then she told one attorney that was questioning her. The first person she told was her friend, and she told her friend a day or two after this incident happened. And then a couple days after that, she told her grandmother. Well, the next attorney who gets up to question Amy asks her about this, and she goes through an entire timeline of the events of the day that this allegedly happened. And at the end of the day, she gets to, then in the evening I went to see my grandmother and I told her about this. Well, you know, which is it? Did you talk to your grandmother several days after this or did you talk to your grandmother that day? If you're going to be that specific, you're going to know which it is. Amy also testified that on the day this happened, after this touch happened, she went to work for her father, and then in the afternoon she went to work for a photography studio where she worked. And that that photographer's studio was taking Little League pictures in the town of Sisney that day. We had the photographer from the studio come in and he brought his records. He testified that the photo shoot in Sisney for Little League was on June 10th. There was no opposing testimony to show it wasn't on June 10th. And so that's an uncontroverted fact. Amy had also testified that this incident occurred on the day that her sister Amber was at FFA camp. She testified it was on a day when her mother was with her grandmother and her sister was at FFA camp, and so the only two in the house were her and her father. Well, the sister testified that she went to FFA camp that year, June 14th to June 16th. So it couldn't possibly have occurred on June 10th and June 14th and 16th. Those are not the same days. But Amy was very exact in her testimony. Further, there was significant testimony of problems that the family had had with Amy. Omega, Michael, and Amber all testified that Amy had been telling lies. There was testimony that Amy was having fights with her mother. There was testimony that the parents had problems with some of Amy's choices in friends. And these things were brought out. The state tries to make it seem like the father is trying to tear down the daughter. In actuality, when you have a juvenile abuse proceeding, you're looking at the best interest of the minor.  And here the court needs to take a broad view. The court needs to say, is this minor a troubled person who is making a false allegation? If so, it needs to be handled one way. Or is this minor a straightforward person who needs this kind of help? If the court won't take in that information and consider it, then they're not doing the best that they can for the minor. So when the court says that the father is trying to disperse the daughter, that's not the case. That also brings me to my next point, that this entire hearing was too contentious to be what the state wanted under a Juvenile Court Act. The Juvenile Court Act is very clear. 705 ILCS 405-1-5 states that proceedings are not intended to be adversary in character. It further states in 705 ILCS 405-1-2, Section 2, this act shall be administered in a spirit of humane concern. There was very much not a spirit of humane concern. It was a very adversarial proceeding. The state did not seem to be trying to find out what was the best interest of the minor, but it seemed to be on a mission to prove the father guilty, even though that's not really the issue here. There is a second circuit case, a second district case from 1993, NRAE-CRH, which I cited in my brief, and that pointed out the statute regarding the necessary for, the necessariness of not having an adversary proceeding, necessary of having it in a humane concern, and that was actually in a juvenile delinquency case, and how much more in a juvenile abuse case should that be heeded. Our next issue is that in this case there were a number of unusual continuances. Under the Juvenile Court Act, there is a very clear statute regarding adjudicatory hearings. On page 21 of my brief, I cited that statute. It's 705 ILCS 405-2-14, sections B through D. The state only has 90 days in order to commence an adjudicatory hearing. Once it's commenced, there's a provision for subsequent delay, may be allowed by the court when necessary to ensure fair hearing. There's also, that's in section B. In C, it's very clear what the requirements are for a continuance. You have to file a written motion no later than 10 days prior, or the court can do it on its own motion and only for a good cause shown, and they may continue the hearing for 30 days, and only if the continuance is consistent with the health, safety, and best interests of the minor. The statute goes on. When the court grants a continuance, it shall enter specific factual findings to support its order, including factual findings supporting the court's determination that the continuance is in the best interests of the minor. In this case, the matter was set for February 3rd. The parties appeared. Most of counsel appeared.  It turns out that she had called the clerk's office that morning and said, I won't be there, I'm sick. The court ended up allowing the continuance, saying, we can't go forward without the mother's attorney. But the court made no factual findings that this was in the best interest of the child. In fact, the GAL testified that, or gave her opinion, that it was not in the best interest of one of the children to continue it, because dragging it out would only harm that child. The court did determine that they would not have trial that day, so they set it for the next week on February 9th. All the attorneys that were present, or the sick attorney was present by phone, they all said that they would be there on that date. When court convened on that date, the attorney for the state announced to the court that it would have to leave, he would have to leave at 11 o'clock because he had a jury trial elsewhere. This was not made known to counsel for the father before that. It apparently had been broached with the court and chambers before this on that morning. But still, the court allowed the second continuance, as I would call it, to occur. The statute only allows one continuance, and that was clearly a violation of statute. If the court deems that second delay to be a delay, not a continuance, it still does not fall within the guidance of the statute. The statute says in Part B, Once commenced, subsequent delay in the proceedings may be allowed by the court when necessary to ensure a fair hearing. And I ask, who does that ensure a fair hearing for? It's certainly not for the father, certainly not for the daughter that wants to get this over with. And it was the state's own fault that it did this instead of planning ahead and making proper preparations. Further, even after all these other factors are considered, even if the court somehow finds that an adjudication was proper in this case, the disposition of worship was not proper in this case. The court had to decide on April 6th if it was going to make the daughter's words of the court. As the third district said in NRACL, which I cited on page 29 of my brief, the juvenile court judge is not required to make every child a word of the court based on the state's petition, but must selectively designate children to become words of the court. In this case, the factors that point against making them words of the court was the fact that they had a mother who had been adjudged by the court to be fit, able, and willing to meet the minor's needs. Since the mother was given physical custody of the child, does that make any difference? Well, it does, because these proceedings keep going on. I'm sorry? The proceedings keep going on. The juvenile court keeps being involved. Really what this has turned into is a divorce case where there are three attorneys against one, potentially, instead of just a divorce case where the court considers each party separately. The mother's now got the state on her side. It's dragging out to two cases instead of one cases. It's getting more contentious than it needs to be. And the mother's got all this extra ammo here that really doesn't need to be here because the mother is extremely adverse to the father, has hired private counsel, has been making arguments on behalf of herself and the children. And when you look through the case law, there are some cases where physical custody is granted to the parent, but the court still decides to keep wardship. And those are cases in which the court finds the parents to be good enough to care for the child on a daily basis, but they have some concerns such as, is the mom going to go back to an abusive relationship? Are they going to follow through with counseling? And those were not the concerns here. Other than this one insulated allegation of abuse, there's not systemic abuse in the family. Mom's clearly not going back to dad, and mom has already accessed counseling for her and the daughters, and she did this way before the state even filed their petition for wardship. So I would say that, you know, regardless of what the court found at the judiciary section, this is not a case where the state needs to step in and maintain control. I mean, this is an extraordinary measure to do this, and it wasn't appropriate in this case. If you have nothing further, that's fine. Counsel? Thank you, Ma'am. Please, the court. Turning first to the sufficiency of the outline. As the court's aware, the legal framework for this issue is particularly important for determining the result of this issue. One, of course, is that the standard or the burden of proof is by a preponderance of the evidence. This is about as low a burden as you have, meaning that it's more probably true than not that the allegations contained therein occur. The standard of review is equally important as well, and it's whether the trial court's ruling mandates reversal. In that sense, it only happens if this court deems the results for the judge's decision to be manifestly unjust or palpably against the weight of the evidence. Another important consideration in these type of cases, and really any type of case, is the circuit court's superior position to hear the testimony of the witnesses, to assess their credibility, to assess consistencies and inconsistencies in the testimony, and relate that to how the court perceives the witnesses to be on the witness stand. That's something that I don't have, this court doesn't have any knowledge of, so we have to defer to the circuit court's superior position to make those findings. Now, Respondent makes some good points here. I agree. I think if you go with any sort of evidentiary hearing, there's going to be good and bad points from an evidentiary standpoint. Some of which, the points the counsel makes, I'm not sure are that persuasive. The fact that Michael maintains his innocence, I suppose that that's not a particularly surprising thing. I do note that during the investigation stage of this, Michael never actually asserted an innocence posture as much as he said, I don't know if it happened, maybe it happened, I don't remember if it was an accident. At one point he told the investigator, well, if she says it happened, then it probably did, because she's truthful, which now I guess she's not truthful. But that's what he told the investigator at the time. With regards to the testimony of other people that offered their opinion that Amy is a liar, that this didn't happen, it didn't happen well, there's only two people that were there when this was alleged to have happened, Amy and the respondent. So, of course, it's really Amy's testimony, as I think Respondent's counsel probably points out, that it's kind of the heart of the case and that what the grandmother thought or what Amy thought or Amber thought of whether Amy's kind of a truthful girl or not is sort of secondary. The principle issue is whether Amy made a credible testimony about what happened. Now, your respondent makes some good points, I agree. There are some inconsistencies in the testimony. There is also, however, if you look at what she alleged happened, it meets the standard, of course, for what the state has to prove. And, of course, if it's believed by the court, then it would be sufficient, and the court has to make that finding back upon the evidence. Secondarily, a lot of the things that counsel points out as being problematic about Amy's testimony is also explainable. For instance, when Amy sort of... the characterization was expanded on her initial allegations. Be that as it may, of course, she's making an allegation against her father of a fairly serious sexual nature. It's not particularly surprising that one might be reluctant to come full form with this type of information until you become more comfortable in the investigation process. Now, counsel argued that the converse may be true, that it may be indicative that she's sort of making things up as she goes along. Perhaps. But it is explainable in terms of, again, in the context of how Amy testified and the type of evidence that she presented. I will say one thing. If Amy has any fault, she's not good at chronology. I think that you see that she's not... She does evidence, I think, some confusion. Counsel makes a point that she got the order mixed up in the fact of who she disclosed these allegations to. Well, as I look at the record, she disclosed, according to her, to a friend, then a grandmother, and then a teacher, and then a guidance counselor, then an investigator of the Department of Children and Family Services, and the Sheriff's Department. So you've got a girl making allegations, telling all these people that she might juxtapose one with the other, I don't think is something that's especially indicative of the fact that she's not telling the truth. The respondent also argues that when she testified, she had linked the date of the offense to her sister being at a Future Farmers of America meeting, and that she had later that evening gone to participate, or assist in a photography session for Lily, and responded to present evidence that wasn't rebutted. In fact, neither of those things occurred on the same date as the allegation. I could just say to that, that she's got a lot of things going on, obviously. She links, and all these things happen pretty close at the same time. If she's linking one with the other, these are the types of things you may see with a youthful witness who is on the witness stand and explaining things and trying to let the court know what happened. It is a factor that the court has to take into consideration in determining the witness's credibility. But again, that's the court's determination. Nothing that's being said here isn't anything that the court itself had access to, and in fact, counsel below did an excellent job I think arguing these particular facts in the circuit court. But nonetheless, the court, having heard the evidence, made this determination. There's nothing inherent in Amy's testimony that is unremovable. Everything that we're discussing here relates to corollary matters, which we were importing into Amy as a person, and Amy's ability to recall things rather than attacking whether the incident itself actually occurred, or whether her testimony about the actual incident is itself unbelievable. And I think that's probably what was persuasive, or particularly persuasive, in the circuit court. So, I don't like to dwell on these issues because this court has the record. If you review the record, you'll see everything here. But I would submit that given the standard review and the burden that the state has at the time it presents the evidence, that it was more than sufficient to meet the preponderance of evidence. I'm a little baffled, I guess, by this argument that this is not intended to be an adversary proceeding, or this is contentious. It was contentious, I suppose, to the extent that it was a hard-fought case, although, having read the statute that Respondent cites, and looked at it in context, I don't see it as saying that everyone goes to court and then we just basically make an allegation, he makes a denial, that's that, and then the court makes a decision. Adversary, or adversarial, has a specific meaning in the context of the right to counsel. It's the right to counsel where that word appears in the relevant statute, when it delineates the rights of the Respondent or Respondents in this type of proceeding. Among those other rights are the rights to confrontation, and the rights to cross-examine, et cetera. So you can see there's kind of a definitive parallel of criminal rights that are being imported into a civil proceeding. My interpretation of this is that when the legislature deems something as not being adversarial, what it's saying is that there's no Sixth Amendment right because the purpose of the proceeding is not to punish the Respondent or Respondents, it is, as we all agree, to determine what happened and then move forward with what's going to be in the best interest of the mind. I don't think that it means that it dictates how a proceeding is to be done. In fact, if you have the right to cross-examination for the Respondent, that in and of itself, apart from anything else, indicates that the adversarial type of proceeding. So I don't think that even the characterization the Respondent presents here is consistent within the very statute that they're citing. The intent of the Juvenile Act, the way I've understood it, the way we tried to follow it when I was actually a juvenile judge in St. Clair County, was you have the recent Supreme Court case in the 70s about the rights of the juvenile. And there's no question that parties have an adverse interest. But the idea of the statute was to take the edge off, in effect, to have an adjudicatory phase where you determine what happened and then a dispositional phase, which is not supposed to be penal in nature. The way I understand the Appellant's argument is the edge was there. It was profoundly adversarial. So isn't that a legitimate argument as far as the question of degrees and what can you argue from the record that the edge, in fact, was really not there? I guess let me start out by saying I'm not certain what edge means. Does it mean sniping at each other and making derisive comments to the court or to opposing parties? Or does it mean guarding your position to ensure that the hearing proceeds along the rules of evidence and proper procedure, which is, I think, if you read the record of this case, you're going to see exactly that's what it is. There were numerous contested issues in this case with regards to admission of certain character evidence. This is one of the issues raised by Respondent Hearing Appeal. There was lengthy argument about that. There were objections, which were repeatedly sustained by the Circuit Court raised by the State to what the State characterizes as impermissible evidence. Look, these hearings, it's still a hearing. It still has to go by the rules of evidence. And it would be nonsensical for the State to just ignore something that it perceives as not in compliance with the rule of evidence, much as I don't think anyone from the State's side would look at the Respondent and say you have to let us do whatever we want. I don't disagree with Your Honor when you say that there has to not be an edge. But I think we have to look at what is contentiousness or what is adversarial in context with what happens in a process where there's two opposing sides attempting to prove their respective cases. The Respondent's case here, I have to disagree. I do think that what the Respondent was trying to do was paint her daughter as a liar. She's a liar in general. She lied about this. Everything that was put on her, the sister, the grandmother, I mean, everything that was geared towards saying this girl is, I mean, we have periods of this hearing where there was an attempt to introduce collateral evidence about how Amy had said false things in completely unrelated matters, which the Court ultimately wound up not allowing into evidence. So I think it's a little difficult for me to subscribe to the notion that the Respondent was denied something along the lines of a fair hearing when the Respondent pushed forward this particular lying argument. So I just think that if there was an edge there, it works both ways. But I don't really think that that edge is the way you might think of the Justice Coleman where she existed. I do think that it was hard fought. I do think that the background of what appeared to be kind of an ugly contested divorce hearing seeped its way into the way the attorneys for the mother and the father may have been treating each other. I saw a little bit of tension there as I read the record. But I think that I don't, there's no authority that I've found that's found an unfair hearing simply because there was a contestation, even if that contestation was even more pointed in its purpose. I do think that while it needs to be focused on the best interests of the minor, there's still got to be rules that everyone has to play by. And I think that there wasn't any complaint raised at the time I think by a respondent's counsel about the contentiousness of this. So I'm sort of seeing it here for the first time. I understand their position. It's a fair one, but I don't think that this case would qualify under that sort of extreme circumstance as a result of an unfair hearing. In regards to the continuances, we operate on this issue under sort of the, I characterize it as a waiver, but it's actually forfeiture. There is a rule that a hearing has to be commenced. It used to have to be completed, but now the rule of the statute says that the hearing has to be commenced within 90 days of the service of process. Continuances that are granted under that statute told the time for the initiation. So I think it's probably important to focus first upon, well, first of all, there was no objection or motion for discharge raised by the respondent at the time that we got past the second continuance or delay in the proceedings. In fact, it wasn't raised at all. Below, the statute operates sort of similarly to the speedy trial statute. The criminal proceeding is where you do have the obligation to raise a motion for discharge. The criminal case is a result of dismissal of charges that's granted. With that being the case, the first continuance occurred when the respondent mother's attorney was ill. And the court has, there are two scenarios in which a continuance can occur at random. One, where a motion is made by a party and this motion has to be made 10 days prior to the hearing. The second circumstance would be on the court's own motion. That doesn't have any sort of delineation of time that's going to be up to the court's discretion. That's where we operate here is under whether the court abuses discretion in continuing this matter. Nobody could foresee that someone was going to be sick until they're sick. And so obviously I don't think anybody knew until the day of this hearing that the respondent's mother was ill. Faced with that scenario, of course, the court had really kind of just a couple of options before. It could either continue the hearing or it could continue the trial. Granted, she got what she wanted out of this, but nonetheless she's still a naming party. She still had the right to counsel. She still had the right to participate in this proceeding. She didn't have an attorney there. Her mother was there, but not an attorney. Proceeding in her absence, I think, could at least from that point going forward, not knowing what was going to happen next, could result in error. It certainly would be in violation of the mother's constitutional rights, or statutory rights. Now, the alternative that the respondent raised in their brief is that, well, could have gotten alternative counsel for the mother, but that's not really a feasible option given the timing of this, and there's no way that anyone could probably become fully acquainted with the nuances of the case or particular arguments or whatever in that short period of time. The other option is to bifurcate the hearing and go straight forward with the father and do the mother later. I'm not even sure that's a legal option. If it were, it's not a practical option because it's the mother, I think, has the right to hear evidence as presented as the father in the cross-examination of those witnesses, et cetera, et cetera, and it becomes a real confusing mess if you do it twice because then the father has to come in for the second time when the mother's case starts, I don't know. It made more sense to delay the six days. So now respondent argues that well, the court didn't make any findings of the record as the best interest of the minor. I agree that there was no real demonstration of prejudice to the father as a result of that brief     in this record... Excuse me. I don't have any evidence to support that. I don't have any evidence to support that. Is there anything in this record that would indicate that the juvenile proceedings, this proceeding, was used as an element or a weapon in a divorce proceeding or custody proceeding or that it was used as an effective discovery device in an ongoing divorce proceeding? The answer to that would be from my perspective. Again, I'm reading the cold record. I think it was done... There was a lot... I mean, obviously, there was cross-examination and it would be probably foolish to think that what happens here isn't going to be in the thought of what the divorce proceeding was for. But I didn't sense that it was just being... Well, certainly the state's got a state divorce proceeding. So, from my perspective, if I look at the mother's counsel's participation, I think it was what you would expect an attorney to do or ask questions about in this type of proceeding. So, you're saying that whatever else was going on, nothing was unusual in this proceeding? It didn't strike me. I mean, this is my 600th appeal. Believe me, I've probably seen 500 cases, far more contentious than this one. So, I mean, it wasn't something that jumped out in that sense. Like I said, it was a hard-fought case and I didn't think there were a lot of hard questions asked, but it didn't proceed under some process to drive a discovery that was  on. I don't know if I'm stepping out of that from the state's perspective. Now, if that first continuance is valid, then the argument kind of collapses because that was the state proceeding. By my calculation, the hearing occurred on the 91st day, that's including the six days that the case was continuing. So, if you stayed in the six days and you really started on the 85th day, there's no error in the statute. I'll stay in the   I don't believe there's any other questions. I don't believe we do. Thank you, counsel. Counsel? When you have a proceeding that involves these types of questions and an ongoing marital relationship and adversarial actions, and the question is whether there was such an edge that it went beyond what the legislature would contemplate when you've got conflicting interests in a hearing situation, but the intent of the legislature is to say we're not in a penal punishment mode or in a best interest mode as to the ultimate disposition as far as the minor is concerned. Well, I would say there was a definite edge in this case. I do trial work. I don't do appellate work for the most part. This is only my second appeal. But I've done order protection cases and I've seen objections going back and forth that it was a battle on every point. There are a lot of times where the state was leading the charge and, you know, I don't know if you can get a sense of it from the record, but it seemed like the state was out to win instead of finding the best interest of the child. So it definitely went beyond just protecting one's interest. You know, in juvenile proceedings, in general, it's maybe a little bit more loosey-goosey than you would have in a different court setting because there is more of a concern for what's the best interest of the child. It's maybe a little less formal normally. This was extremely formal. It was extremely hard fought over technical points, and it just continued to be that way throughout. And that was definitely the opposite of the case. You know, it wasn't a matter of, okay, well, let's let this go a little further and see where they're getting. Let's jump on it right now and quash any attempt to get through information. I would also say, you know, the State pointed out that there's progress of evidence, which is true, but the fact of the matter is the State's burden to prove it. The State has to get over the level of proof, has to prove their case. And, you know, if you read through the record, I mean, you'll find a number of times where the courts say, what did she say, you know, that type of stuff. So, you know, the court's there, but it's not a it's maybe not as crystal clear just from being there as the State would make it to be, because there are  people who are not good at chronology. Well, what it is here goes beyond very far from not good at chronology, you know. Five minutes she's saying, okay, I talked to my friend, you know, she'd be very specific, you know, I went to work for my dad, I went and got him an ice cream sundae, I went to Walmart, I went to work with Sissy, you know, she's very specific, she's not, you know, she doesn't seem to be lacking in chronology, but it seems to be a new coherent story, but she changed it. She said, yeah, I went to tell my friend, and a couple days later I told my grandmother, you know, it's just a muddled story, and it's not a matter of being not good at chronology. Other than that, I will stand on my brief as well unless there are further questions. I don't believe there are, thank you. We appreciate the briefs and arguments of the council, we take the case under advisement, thank you.